## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| CELESTE M. BAKER, Derivatively on behalf of FRONTIER COMMUNICATIONS CORPORATION,<br><br>       Plaintiff,<br><br>   v.<br><br>DANIEL J. MCCARTHY, RALPH PERLEY MCBRIDE, DONALD W. DANIELS, LEROY T. BARNES, JR., PETER C.B. BYNOE, DIANA S. FERGUSON, EDWARD D. FRAIOLI, PAMELA D. A. REEVE, VIRGINIA P. RUESTERHOLZ, HOWARD L. SCHROTT, MARK S. SHAPIRO, MYRON A. WICK, III, JOHN M. JURELLER, and MARY A. WILDEROTTER,<br><br>      Defendants,<br><br>   -and-<br><br>FRONTIER COMMUNICATIONS CORPORATION, a Delaware corporation,<br><br>      Nominal Defendant. | Case No.:<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Date: October 25, 2017 |

By and through her undersigned counsel, Plaintiff Celeste M. Baker ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Frontier Communications Corporation ("Frontier" or the "Company") and against certain current and former officers and directors of the Company for issuing false and misleading proxy statements in violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as for breaches of fiduciary duties, unjust enrichment, and corporate waste.  Plaintiff makes these allegations upon personal knowledge as to those allegations concerning herself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Frontier and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Individual Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Frontier's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related securities fraud class actions, *Bray v. Frontier Communications Corporation, et al.*, No. 3:17-cv-01617-VAB (D. Conn.), filed September 26, 2017, *Rozenberg v. Frontier Communications Corporation, et al.*, No. 3:17-cv-01672-MPS (D. Conn.), filed October 4, 2017, and *Morrow v. Frontier Communications Corporation, et al.*, No. 3:17-cv-01759-MPS (D. Conn.), filed October 19, 2017 (collectively, the "Securities Class Actions"); and (e) review of other publicly-available information concerning Frontier and the Individual Defendants.

## NATURE AND SUMMARY OF THE ACTION

1.      This derivative action arises from the repeated false and misleading statements made on behalf of the Company by the Individual Defendants, following the Company's

acquisition of the wireline operations of Verizon Communications, Inc. ("Verizon"), including that the Company acquired a substantial number of non-paying accounts as part of the acquisition, and as a result, the Company would be required to increase its reserves, and write-off amounts from accounts receivable associated with the non-paying accounts.

2.      Frontier, a Delaware corporation founded in 1927, provides communications services in the United States, including broadband, video, and voice services.

3.      On February 5, 2015, the Company announced a definitive agreement to acquire the wireline operations of Verizon Communications, Inc. (the "Verizon Acquisition") in California, Texas and Florida for a purchase price of $10.54 billion in cash and assumed debt. At the release of the news, over the course of a week, the price per share of Frontier common stock increased more than 8.7% from an adjusted close of $115.50 on February 5, 2015, to an adjusted close of $125.55 on February 12, 2015.

4.      According to the Company, on April 1, 2016, it completed the Verizon Acquisition, and acquired the wireline operations of Verizon in California, Texas, and Florida, for a purchase price of $10.54 billion in cash and assumed debt.  However, throughout the Relevant Period (defined below), the Individual Defendants caused Frontier to fail to disclose the underperformance of the Verizon Acquisition.

5.      On February 27, 2017, the Individual Defendants caused the Company to disclose a net loss of $80 million for the fourth quarter of 2016 ("Q4 2016"), and state that its results were impacted by the "resolution of non-paying acquired CTF accounts."  The Company's Chief Executive Officer ("CEO"), Defendant Daniel J. McCarthy ("McCarthy"), elaborated, stating: "[r]esults for the fourth quarter were impacted by our intensified efforts to resolve acquired accounts in California, Texas and Florida that we have determined to be non-paying."

6.      On that same day, February 27, 2017, the Company held a conference call to discuss the Q4 2016 financial results.  On the call, Defendant McCarthy stated that the Company had been working through the account-cleanup process since July 20, 2016, that the Company began disconnecting non-paying accounts at the end of August 2016, and that the disconnects continued through the first quarter of 2017 ("Q1 2017").  McCarthy further stated that the Company began to reserve aging accounts in accordance with normal policies in the second quarter of 2016 ("Q2 2016"), and then increased its reserves.  Finally, McCarthy stated that the Company began permanent disconnects and receivable write-offs in the third quarter of 2016 ("Q3 2016"), and continued them in Q4 2016.

7.      On this news, the Company's stock price fell $0.36 per share (nearly 11%), on unusually-heavy trading volume, to close at $2.93[1] per share on February 28, 2017, erasing $424 million dollars in market capitalization.

8.      On May 2, 2017, the Company reported a Q1 2017 net loss of $75 million and a year-over-year first quarter revenue decline of $53 million.  On that same day, the Company held a conference call to discuss its Q1 2017 financial results.  On the call, the Company's Chief Financial Officer ("CFO"), Defendant Ralph Perley McBride ("McBride"), stated that approximately $16 million of the sequential revenue decline was a result of cleanup of CTF non-paying accounts and the automation of legacy non-pay disconnects.  Specifically, he stated that "[t]he CTF account cleanup reduced Q1 revenue by $11 million, and the one-time impact related to automating the non-pay disconnect process for the legacy properties, reduced Q1 revenue by $5 million."

---

[1] On or about May 12, 2017, Frontier's Board of Directors (the "Board") announced a reverse stock split at a ratio of one share for fifteen shares, which the Company announced was completed on July 10, 2017.

9.     On this news, the Company's stock price fell another $0.32 per share (more than 16%), on unusually-heavy trading volume, to close at $1.61 per share on May 3, 2017, erasing $376.9 million more in market capitalization.

10.     As detailed further below, from at least February 6, 2015 through the present (the "Relevant Period"), the Individual Defendants caused Frontier to issue false and misleading statements concerning the Company's business, operational, and compliance policies. Specifically, the Individual Defendants caused the Company to make false and/or misleading statements, and/or failed to disclose that: (i) the Company acquired a substantial number of non-paying accounts as part of its acquisition of the wireline operations of Verizon; (ii) as a result, the Company would be required to increase its reserves, and write-off amounts from accounts receivable associated with the non-paying accounts; (iii) Frontier had inadequate corporate accounting and corporate financial reporting resources; (iv) Frontier inadequately assessed the risks associated with the Company's financial reporting; (v) Frontier failed to maintain effective internal controls over financial reporting; and (vi) as a result of the foregoing, Frontier's public statements were materially false and misleading, and/or lacked a reasonable basis at all relevant times.

11.     As a result of the Individual Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, the Company has suffered significant losses and damages.

12.     Frontier's Board has not commenced, and will not commence, litigation against the Individual Defendants named in this Complaint, let alone vigorously prosecute such claims. Among other things, all or a substantial majority of the Board members: (i) are directly interested in the personal financial benefits challenged herein that were not shared with Frontier

shareholders; (ii) face a substantial likelihood of liability to Frontier for breaching their fiduciary duties of loyalty and good faith, and by authorizing or failing to correct the false and misleading statements alleged herein; and/or (iii) otherwise lack the requisite independence or disinterestedness. Accordingly, as a matter of Delaware law, a pre-suit demand upon Frontier's Board to bring these claims would be, and is, a useless and futile act. Thus, Plaintiff rightfully brings this action in the name of, and on behalf of, Frontier to vindicate the Company's rights against the Individual Defendants named herein, and to hold them responsible for the grievous damages that they, as wayward fiduciaries, have caused—and will cause—the Company.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that the Complaint states a federal question. The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     Venue is proper in this district under 28 U.S.C. § 1391 because: (a) Frontier maintains its principal executive offices in this District; (b) one or more of the Defendants reside(s) in this District; (c) a substantial portion of the transactions and wrongs complained of herein—including the Individual Defendants' primary participation in the wrongful acts—occurred in this District; and (d) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

15.     In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## THE PARTIES

### A.    Plaintiff

16.    Plaintiff Celeste M. Baker has been a Frontier shareholder since prior to the start of the Relevant Period, and is currently, and at all relevant times has been, a holder of Frontier common stock.

### B.    Nominal Defendant

17.    Nominal Defendant Frontier was founded in 1927, is incorporated in Delaware, and maintains its principal executive offices at 401 Merritt 7, Norwalk, Connecticut 06851.  On or about December 30, 2011, Frontier conducted its initial public offering and began trading on the NASDAQ under the symbol "FTR."  The Company currently has approximately 79 million shares outstanding.

### C.    Individual Defendants

18.    Defendant Daniel J. McCarthy has served as a Director of Frontier since May 2014, as well as Frontier's President and CEO since April 2015.  Prior to becoming President and CEO, McCarthy held other positions of increasing responsibility at the Company, including President and Chief Operating Officer ("COO") from April 2012 to April 2015, Executive Vice President and COO from January 2006 to April 2012, and Senior Vice President, Field Operations from December 2004 to December 2005.  The Company acknowledges that McCarthy is not an independent director.  McCarthy received a sum of $8,431,707 in total compensation from Frontier from 2015 to 2016, including $5,118,891 in 2015, and $3,312,816 in 2016.  McCarthy is a defendant in the Securities Class Actions.

19.     Defendant Ralph Perley McBride has served as Executive Vice President and CFO of Frontier since November 4, 2016.  Prior to that, from 1994 to 1997 and 1999 to 2010, McBride held senior financial roles at Frontier, including Vice President of Financial Planning and Analysis.  McBride received a sum of $308,921 in total compensation from Frontier in 2016. McBride is a defendant in the Securities Class Actions.

20.     Defendant Donald W. Daniels ("Daniels") has served as Frontier's Senior Vice President and Controller since July 7, 2014.   Daniels is a defendant in the Securities Class Actions.

21.     Defendant Leroy T. Barnes, Jr. ("Barnes") has served as a Director of Frontier since May 2005.  Barnes serves as a member of the Audit Committee, as well as Chair of the Retirement Plan Committee.  Barnes received a sum of $454,478 in total compensation from Frontier from 2015 to 2016, including $224,478 in 2015, and $230,000 in 2016.

22.     Defendant Peter C.B. Bynoe ("Bynoe") has served as a Director of Frontier since October 2007.  Bynoe serves as a member of the Compensation Committee, as well as Chair of the Nominating and Corporate Governance Committee.  Bynoe received a sum of $460,000 in total compensation from Frontier from 2015 to 2016, including $230,000 in 2015, and $230,000 in 2016.

23.     Defendant Diana S. Ferguson ("Ferguson") has served as a Director of Frontier since October 2014.   Ferguson serves as a member of the Audit Committee and the Compensation Committee.  Ferguson received a sum of $430,000 in total compensation from Frontier from 2015 to 2016, including $215,000 in 2015, and $215,000 in 2016.

24.     Defendant Edward D. Fraioli ("Fraioli") has served as a Director of Frontier since July 2010.   Fraioli serves as Chair of the Audit Committee, as well as a member of the

– 8 –

Retirement Plan Committee.  Fraioli received a sum of $480,000 in total compensation from Frontier from 2015 to 2016, including $240,000 in 2015, and $240,000 in 2016.

25.     Defendant Pamela D. A. Reeve ("Reeve") has served as a Director of Frontier since July 2010, and has served as Chairman of the Board since April 1, 2016.  Reeve received a sum of $590,660 in total compensation from Frontier from 2015 to 2016, including $238,160 in 2015, and $352,500 in 2016.

26.     Defendant Virginia P. Ruesterholz ("Ruesterholz") has served as a Director of Frontier since August 2013.  Ruesterholz serves as Chair of the Compensation Committee, as well as a member of the Retirement Plan Committee.  Ruesterholz received a sum of $462,637 in total compensation from Frontier from 2015 to 2016, including $227,637 in 2015, and $235,000 in 2016.

27.     Defendant Howard L. Schrott ("Schrott") has served as a Director of Frontier since July 2005.  Schrott serves as a member of the Audit Committee, the Nominating and Corporate Governance Committee, and the Retirement Plan Committee.  Schrott received a sum of $439,203 in total compensation from Frontier from 2015 to 2016, including $224,203 in 2015, and $215,000 in 2016.

28.     Defendant Mark S. Shapiro ("Shapiro") has served as a Director of Frontier since July 2010.  Shapiro serves as a member of the Retirement Plan Committee.  Shapiro received a sum of $430,000 in total compensation from Frontier from 2015 to 2016, including $215,000 in 2015, and $215,000 in 2016.

29.     Defendant Myron A. Wick, III ("Wick") has served as a Director of Frontier since March 2005.  Wick serves as a member of the Compensation Committee and the Nominating and

Corporate Governance Committee.  Wick received a sum of $435,522 in total compensation from Frontier in 2016, including $220,522 in 2015, and $215,000 in 2016.

30.    Defendant John M. Jureller ("Jureller") served as Frontier's CFO from January 2013 to November 4, 2016.  Jureller received a sum of $4,516,128 in total compensation from Frontier from 2015 to 2016, including $2,716,987 in 2015, and $1,799,141 in 2016.  Jureller is a defendant in the Securities Class Actions.

31.    Defendant Mary A. Wilderotter ("Wilderotter") served as Frontier's CEO from November 2004 to April 3, 2015, as well as its President from November 2004 to April 2012. Wilderotter also served as a Director of Frontier from September 2004 to March 31, 2016, including as Chairman of the Board from December 2005 to April 3, 2015, and as Executive Chairman of the Board from April 1, 2015 to March 31, 2016.  According to the Company's 2016 Proxy (defined below), Wilderotter's "key accomplishments" in fiscal 2015 included "the negotiation of and entry into the agreement with Verizon Communications Inc. to acquire the California, Texas and Florida wireline properties and the achievement of key milestones to close that transaction."  Wilderotter retired and stepped down from the Board on March 31, 2016. Wilderotter received a sum of $12,101,520 in total compensation from Frontier from 2015 until, and in connection with, her resignation in 2016.  Wilderotter, in connection with her resignation, was entitled to certain benefits pursuant to her employment agreement, valued at approximately $6,431,296, which included: (i) the vesting of her outstanding restricted stock awards as though her service continued for an additional 12 months beyond her resignation date, valued at approximately $4,992,533; (ii) the vesting of her restricted stock units in accordance with their terms, and the vesting of her performance shares upon her resignation based on actual performance, valued at approximately $1,124,337; and (iii) certain other benefits, including,

*inter alia*, the receipt of accrued but unpaid vacation time, and the cost for continued medical, dental, and other health benefits, and extended life insurance for 36 months after her resignation, valued at approximately $314,427.

32.     Defendants McCarthy, McBride, Jureller, Daniels, Barnes, Bynoe, Ferguson, Fraioli, Reeve, Ruesterholz, Schrott, Shapiro, Wick, and Wilderotter are, at times, referred to collectively herein as the "Individual Defendants."

33.     Defendants Barnes, Bynoe, Ferguson, Fraioli, McCarthy, Reeve, Ruesterholz, Schrott, Shapiro, and Wick are, at times, referred to collectively herein as the "Director Defendants."

34.     Defendants Barnes, Ferguson, Fraioli, and Schrott are, at times, referred to collectively herein as the "Audit Committee Defendants."

35.     Defendants McCarthy, McBride, Jureller, Daniels, and Wilderotter are, at times, referred to collectively herein as the "Officer Defendants."

36.     As directors and/or officers of Frontier, the Individual Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known the adverse, non-public information about Frontier's business, operational, and compliance policies, prospects, internal controls, and financials because of their access to internal corporate documents, conversations, and connections with one another as well as other corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to them in connection therewith.  The Individual Defendants either participated in, caused, failed to correct, and/or failed to take action to remedy the harm inflicted upon Frontier through, *inter alia*, the issuance of the improper

statements disseminated via press releases, SEC filings, and other means to the press, securities analysts, and Frontier stockholders.

## SUBSTANTIVE ALLEGATIONS[2]

**A.    The Individual Defendants Caused Frontier to Make Materially False and Misleading Statements During the Relevant Period**

37.    On February 5, 2015 (the day before of the Relevant Period), after the market closed, the Individual Defendants caused Frontier to issue a press release (the "February 2015 Press Release"), also attached as exhibit 99.1 to the Form 8-K filed with the SEC, announcing a definitive agreement to acquire the wireline operations of Verizon in California, Texas, and Florida.  The February 2015 Press Release stated, in relevant part:

> **Frontier Communications to Acquire Verizon's Wireline Operations in California, Florida and Texas, Doubling Frontier's Size and Driving Shareholder Value**
>
> **STAMFORD, Conn., February 5, 2015** – Frontier Communications Corporation (NASDAQ:FTR) is today announcing a definitive agreement with Verizon Communications Inc. (NYSE:VZ) under which Frontier will acquire Verizon's wireline operations that provide services to residential, commercial and wholesale customers in California, Florida and Texas, for $10.54 billion in cash. These Verizon properties include 3.7 million voice connections, 2.2 million broadband connections, and 1.2 million FiOS® video connections. The network being acquired is the product of substantial capital investments by Verizon and is 54 percent FiOS enabled. Subject to regulatory approval, the transaction is expected to close in the first half of 2016.
>
> "This transaction marks a natural evolution for our company and leverages our proven skills and established track record from previous integrations," said Maggie Wilderotter, Frontier Communications Chairman and Chief Executive Officer.
>
> "***These properties are a great fit for Frontier and will strengthen our presence in competitive suburban markets and accelerate our recent market share gains. We look forward to realizing the benefits this transaction will bring to our shareholders, customers and employees***."

---

[2] All textual emphases in quoted material in this Complaint are added unless otherwise noted.

Lowell C. McAdam, Chairman and Chief Executive Officer of Verizon, said, "This transaction will further strengthen Verizon's focus on extending our leadership position in our core markets and create value for both Verizon and Frontier shareholders. Frontier has proven to be an excellent partner. Together we will ensure a smooth transition for our customers and employees, and I have no doubt these teams will continue putting the customer first."

Dan McCarthy, Frontier's President and Chief Operating Officer, commented, "This transaction is an exciting opportunity for Frontier. We are well-positioned to maximize value for our shareholders and create a great experience for new customers. We have four FiOS markets today from our 2010 transaction with Verizon, and a high level of familiarity with the systems underlying these properties. We plan to flash-cut convert these properties to Frontier's systems as we did in states including West Virginia and Connecticut."

The transaction provides substantial benefits, including:

**Strong Revenues, Accretion to Free Cash Flow and Dividend Sustainability:** The Verizon wireline operations being acquired by Frontier generated revenue of more than $5.7 billion in 2014. As a result of certain Verizon-allocated overhead costs not transferring to Frontier, or being replaced by Frontier's lower cost structure, Frontier expects costs to be reduced by $525 million in the first year after close and $700 million by year three. Frontier expects the transaction to be 35 percent accretive to free cash flow per share in year one and to improve Frontier's strong dividend payout ratio by 13 percentage points.

**Delivers Significant Customer Benefits:** Frontier expects a smooth transition for customers in its new markets. Frontier will extend its local engagement model of being active in the communities it serves and provide superior levels of customer service and differentiated offerings.

**High-Quality Assets:** Verizon has invested more than $7 billion in the buildout of FiOS in the acquired territories, which now enjoy a high availability of FiOS services: fully 54 percent of the acquired network is FiOS enabled.

**Tax Structure:** The transaction will be structured as an asset purchase for tax purposes; with an estimated net present value benefit of approximately $1.9 billion to Frontier and its shareholders.

**Transaction Details, Terms and Approvals**

Under the terms of the transaction, Frontier will pay Verizon $10.54 billion in cash at closing, representing 3.7x 2014E Pro Forma Day 1 EBITDA.

Frontier will finance this acquisition with the issuance of a combination of equity and equity-linked securities, as well as debt. Frontier has secured a commitment for bridge financing from J.P. Morgan, Bank of America Merrill Lynch and

Citibank for 100 percent of the purchase price. The transaction is not subject to a financing condition.

The transaction is subject to regulatory approvals and customary closing conditions, including review by the U.S. Federal Communications Commission, the U.S. Department of Justice, and certain governmental authorities in the states covered. The transaction is expected to close in the first half of 2016.

38.     On February 19, 2015, the Company held a conference call (the "Q4/FY 2014 Call") to discuss its results for the fourth quarter of 2014 ("Q4 2014") and fiscal year 2014.  On the Q4/FY 2014 Call, Defendant McCarthy stated:

Everyone in the company is excited by the news of our plans to acquire markets in California, Florida, and Texas.  This represents a phenomenal opportunity for our employees to take on new challenges, and *we are confident that this transaction will be very rewarding for our shareholders too.*

39.     During the Q4/FY 2014 Call, Defendant Jureller also stated:

Before we pass the call back for your questions, let me reiterate a few of the key points of our recently announced $10.54 billion transaction with Verizon for the acquisition of their wireline properties in California, Texas, and Florida.  This is a transformative opportunity, one that meaningfully enhances our long-term competitive position. Further, it significantly enhances shareholder value.

On a pro forma basis, we estimate that in the first full-year, this will add approximately $5.4 billion of revenue and $2.3 billion of adjusted day-one EBITDA.  Total new Frontier revenue and EBITDA will be approximately $11.7 billion and $4.9 billion, respectively.  We estimate that this transaction will be 35% accretive to our leveraged free cash flow per share, and lower our dividend payout ratio by 13 percentage points in the first full-year.

We are comfortable with a pro forma leverage, with our financing plans allowing us to maintain our corporate and unsecured debt ratings.  We currently estimate being in the public markets in the second half of 2015 with our capital raising plans that include approximately $3 billion of equity and $8 billion of debt.  We will be opportunistic in completing our financing prior to the estimated first-half 2016 completion of this transaction.

40.     On February 25, 2015, the Individual Defendants caused Frontier to file its annual report on Form 10-K for Q4 2014 and fiscal year 2014 (the "2014 10-K").  The 2014 10-K reaffirmed the previously-announced details regarding the Verizon Acquisition, and was signed

– 14 –

by Defendants Barnes, Bynoe, Daniels, Ferguson, Fraioli, McCarthy, Reeve, Ruesterholz, Schrott, Segil, Shapiro, Wick, Wilderotter, and Jureller.

41.     On April 3, 2015, the Individual Defendants caused Frontier to file a proxy statement with the SEC, pursuant to Section 14(a) of the Exchange Act (the "2015 Proxy").  The 2015 Proxy described director responsibilities, the duties of each committee, Board risk management, and provided information about the director nominees up for reelection.  However, the 2015 Proxy misrepresented and/or failed to disclose that (i) Frontier had inadequate corporate accounting and corporate financial reporting resources; (ii) Frontier inadequately assessed the risks associated with the Company's financial reporting; (iii) Frontier failed to maintain effective internal controls over financial reporting; and (iv) as a result of the foregoing, Frontier's public statements were materially false and misleading at all relevant times.

42.     On April 20, 2015, the Individual Defendants caused Frontier to file a registration statement and prospectus on Form S-3ASR (the "2015 Registration Statement"), pursuant to which the Company would issue common stock and preferred stock for sale.  The 2015 Registration Statement incorporated by reference the 2014 10-K.  The 2015 Registration Statement was signed by Defendants Barnes, Bynoe, Daniels, Ferguson, Fraioli, Jureller, McCarthy, Reeve, Ruesterholz, Schrott, Shapiro, Wick, and Wilderotter.

43.     On May 7, 2015, the Individual Defendants caused Frontier to file its quarterly report on Form 10-Q for Q1 2015 (the "Q1 2015 10-Q").  The Q1 2015 10-Q reaffirmed the previously-announced details regarding the Verizon Acquisition, and contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants McCarthy and Jureller, which stated that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

44.   On June 8, 2015, the Individual Defendants caused Frontier to file two prospectus supplements on Form 424B2 (the "2015 Prospectus Supplements"), which stated that the Company would be offering 17,500,000 shares of 11.125% mandatory, convertible, preferred stock (or 19,250,000 shares if the underwriters exercise their overallotment option to purchase additional shares in full), at a price of $100.00 per share, for proceeds of $1.75 billion, and would be concurrently offering 150,000,000 shares of common stock (plus up to an additional 15,000,000 shares that the underwriters had the option to purchase), at a price of $5.00 per share, for proceeds of $750 million.   The 2015 Prospectus Supplements reaffirmed the previously-announced details regarding the Verizon Acquisition, and explicitly stated that, "[p]ursuant to the terms of the Verizon Purchase Agreement, [Frontier] intend[s] to place a portion of the proceeds of this offering and the concurrent offering into escrow for use solely in paying amounts payable pursuant to the Verizon Purchase Agreement."   The 2015 Prospectus Supplements also incorporated by reference the 2014 10-K and the Q1 2015 10-Q.

45.   On June 10, 2015, the Individual Defendants caused Frontier to issue a press release (the "June 2015 Press Release"), and filed a Form 8-K with the SEC, announcing that the Company had closed the secondary offerings of $750 million worth of common stock, and $1.75 billion worth of 11.125% mandatory, convertible, preferred stock, as previously described in the Prospectus Supplement.  The June 2015 Press Release also stated, "Frontier intends to use the proceeds from the offerings to finance a portion of the cash consideration payable in connection with Frontier's previously announced acquisition of the wireline operations of Verizon Communications Inc. in California, Florida and Texas and to pay related fees and expenses."

46.     On August 3, 2015, the Company held a conference call (the "Q2 2015 Call") to discuss its results for the second quarter of 2015 ("Q2 2015").  On the Q2 2015 Call, Defendant McCarthy stated:

> ***The Verizon acquisition will transform Frontier.***  As you can see from the pie chart on this slide, with the addition of the Verizon markets residential voice revenues will constitute less than 20% of Frontier's pro forma revenue based on 2014 run rates.   Likewise, wireless backhaul revenues from the continuing Frontier territories will comprise only about 2% of overall revenues, making any future declines less consequential.
>
> We will also gain a substantially and large FiOS footprint and much greater scale.  ***This transaction increases Frontier's growth profile and reduces our exposure to declining portions of our business, improving our business mix significantly.***  Another benefit of this transaction is the technology refresh that we will enjoy for our existing FiOS markets.  We are currently finalizing our plans to introduce this new technology in these FiOS markets in Q4.   The new FiOS platform and existing Verizon pricing and bundles will become the new standard for our current FiOS markets later this year.   This will allow us to have three to six months of operation of the refreshed platform prior to integration of the new states.   We will utilize this time to get our team very comfortable with the new features, functionality and business processes needed to support the current FiOS platform.   And then we will continue the exact Verizon pricing and bundle construction in the new markets following conversion.   As a result, we will not see the migration impact we saw in Connecticut in Q1.
>
> This conversion change   will reduce   training requirements of transferring employees, maintain the effectiveness of alternate channel partners, and most importantly, ***prevent the possibility of revenue declines associated with bundle migration as we experienced in Connecticut.    We continue to anticipate significant synergies as we substitute Frontier's lower cost structure for Verizon's.***
>
> The Frontier team is working to deliver at or above synergies and EBITDA levels that we have communicated.  The key driver of our synergies is the elimination of the Verizon expense allocations.  As we approach the midpoint of our integration efforts we remain highly confident in delivering on pro forma financial projections.
>
> We continue to estimate that the completion of the Verizon transaction will provide over 30% accretion to leverage free cash flow per share in the first full year and will result in a solid improvement to our dividend payout ratio.

47.     On November 3, 2015, the Company held a conference call (the "Q3 2015 Call")

to discuss its results for the third quarter of 2015 ("Q3 2015").  On the Q3 2015 Call, Defendant

McCarthy stated:

> Most importantly, ***I want to assure you that I am fully confident that we will
> achieve, and even exceed the synergy targets we have outlined for Frontier post-
> close of the Verizon transaction.***   Furthermore, we also will have identified
> opportunities to improve efficiencies in our existing business post-closing,
> through the application of new technologies that we are developing as part of the
> Verizon integration.   We anticipate that this will result in an incremental
> improvement to our expenses.
>
> Please turn to slide four.   Let me turn to a quick update on our Verizon
> transaction.   As you know, the Verizon acquisition will transform Frontier
> significantly, materially transitioning Frontier's revenue to a more diversified mix
> with better growth prospects.   Our integration teams continue to work diligently,
> and we remain confident that we will be ready for closing on March 31, 2016.
>
> Financing is completely in place, regulatory approvals are nearly complete with
> one pending, union agreements have been reached, and integration is on track.  I
> would like to provide more details on the integration process and our current
> status.
>
> First, we now have completed all integration project plans that detail all our
> responsibilities, and critical paths in transitioning the network traffic from
> Verizon's network onto ours.   Also covered is the system conversion, as well as
> customer data migration.   This is a highly complex process, and attention to detail
> is critical.   Our goal is flawless execution.
>
> In this regard, I am very pleased to report that we have had the successful
> completion of our first mock data conversion.   This process is off to a great start.
> We will have several more, before we are ready to close, and our internal results
> are ahead of our expectations.
>
> In terms of IT, we are continuing to put in place the necessary features and
> capabilities to handle the new market.   This touches all elements of the business,
> handling dramatically expanded customer data, processing twice the number of
> monthly bills, and supporting double the number of employees.

48.     On September 9, 2015 and September 11, 2015, respectively, the Individual

Defendants caused the Company to issue press releases (the "September 2015 Press Releases"),

announcing a private offering of $6.6 billion aggregate principal amount of unsecured Senior

Notes, as follows: $1 billion of 8.875% Senior Notes due 2020; $2 billion of 10.500% Senior

Notes due 2022; and $3.6 billion of 11.000% Senior Notes due 2025.  The September 2015 Press

Releases also stated:

> Frontier intends to use the proceeds from the offering to finance a portion of the
> cash consideration payable in connection with its previously announced
> acquisition of the wireline properties of Verizon Communications Inc. in
> California, Florida and Texas and to pay related fees and expenses. The
> acquisition is expected to close by the end of the first quarter of 2016. The net
> proceeds of the offering will be deposited in an escrow account to partially fund
> the acquisition or, if the acquisition is terminated or otherwise not consummated
> on or before August 6, 2016, to redeem the Notes at par plus accrued interest.

On this news, the Company's stock price fell $0.29 (more than 5%), on unusually-heavy trading

volume, to close at $5.22 per share on per share on September 14, 2015, erasing nearly

$342 million dollars in market capitalization.

49.     On February 25, 2016, the Individual Defendants caused Frontier to file its annual

report on Form 10-K for Q4 2015 and fiscal year 2015 (the "2015 10-K").  The 2015 10-K

reaffirmed the previously-announced details regarding the Verizon Acquisition and the

secondary offering, and was signed by Defendants Barnes, Bynoe, Daniels, Ferguson, Fraioli,

McCarthy, Reeve, Ruesterholz, Schrott, Segil, Shapiro, Wick, Wilderotter, and Jureller.

50.     On March 31, 2016, the Individual Defendants caused Frontier to file a proxy

statement with the SEC, pursuant to Section 14(a) of the Exchange Act (the "2016 Proxy").  The

2016 Proxy described director responsibilities, the duties of each committee, Board risk

management, and provided information about the director nominees up for reelection.  However,

the 2016 Proxy misrepresented and/or failed to disclose that (i) Frontier had inadequate corporate

accounting and corporate financial reporting resources; (ii) Frontier inadequately assessed the

risks associated with the Company's financial reporting; (iii) Frontier failed to maintain effective

internal controls over financial reporting; and (iv) as a result of the foregoing, Frontier's public statements were materially false and misleading at all relevant times.

51.     On April 1, 2016, the Individual Defendants caused Frontier to issue a press release (the "April 2016 Press Release"), also attached as exhibit 99.1 to the Form 8-K filed with the SEC, announcing the completion of the Verizon Acquisition.  The April 2016 Press Release stated, in relevant part:

### Frontier Communications Completes Acquisition of Verizon Wireline Operations in California, Texas and Florida

**NORWALK, Conn., April 1, 2016** – Frontier Communications Corporation (NASDAQ: FTR) today announced completion of its $10.54 billion acquisition of Verizon Communications, Inc. (NYSE: VZ) wireline operations providing services to residential, commercial and wholesale customers in California, Texas and Florida. The acquired businesses include approximately 3.3 million voice connections, 2.1 million broadband connections, and 1.2 million FiOS® video subscribers, as well as the related incumbent local exchange carrier businesses. New customers will begin receiving monthly bills starting in mid-April.

"This is a transformative acquisition for Frontier that delivers first-rate assets and important new opportunities given our dramatically expanded scale," said Daniel J. McCarthy, Frontier's President and Chief Executive Officer. "It significantly expands our presence in three high-growth, high-density states, and improves our revenue mix by increasing the percentage of our revenues coming from segments with the most promising growth potential."

Frontier is pleased to welcome from Verizon approximately 9,400 employees. "Our new colleagues know their markets, their customers and their business extremely well," McCarthy said. "As valued members of the Frontier team, they will ensure continuity of existing customer relationships."

52.     On April 22, 2016, the Individual Defendants caused Frontier to file a registration statement and prospectus on Form S-4 (the "2016 Registration Statement"), pursuant to which the Company would issue senior notes as previously identified in the September 2015 Press Releases.  The 2016 Registration Statement noted that proceeds from sale of the senior notes "will be used to consummate, or in connection with the financing of, the Verizon Acquisition and any related financing."   The 2016 Registration Statement incorporated by reference the

2015 10-K.  The 2016 Registration Statement was signed by Defendants Barnes, Bynoe, Daniels,

Ferguson, Fraioli, Jureller, McCarthy, Reeve, Ruesterholz, Schrott, Shapiro, and Wick.

53.    On May 3, 2016, the Individual Defendants caused Frontier to issue a press

release (the "May 2016 Press Release"), also attached as exhibit 99.1 to the Form 8-K filed with

the SEC, announcing the Company's Q1 2016 financial results.  The May 2016 Press Release

stated, in relevant part:

> **Norwalk, Conn., May 3, 2016** – Frontier Communications Corporation
> (NASDAQ: FTR) today reported that it achieved solid first quarter results while
> preparing for the industry's largest and most complex flashcut conversion in its
> new California, Texas and Florida markets.  The flashcut conversion was
> executed on April 1, and the Company will begin to realize financial results from
> its newly combined business in the coming quarters.
>
> "We see enormous opportunity in these new markets with millions of new
> customers," said Dan McCarthy, Frontier President and Chief Executive Officer.
> "In addition to increased scale, these areas are each very attractive with
> significant growth potential.  After a month of operating these properties, we are
> very pleased with the progress we have made and we want to thank customers for
> their patience during the transition period.  The entire Frontier team remains
> focused on cultivating growth by retaining and attracting new customers.  We will
> continue to drive Frontier's performance to maintain free cash flow that provides
> an attractive and sustainable dividend payout ratio."
>
> Frontier reported first quarter 2016 revenue of $1,355 million, operating income
> of $58 million and net loss of $186 million, or $0.16 per share.  Excluding
> acquisition related interest expense of $188 million and acquisition and
> integration costs of $138 million (combined after-tax impact of $200 million, or
> $0.17 per share), non-GAAP adjusted net income was $14 million, or $0.01 per
> share, for the first quarter of 2016 (See attached Schedule B).
>
> **Total revenue** for the first quarter of 2016 was $1,355 million.  This represents a
> sequential decline of $58 million, or 4%, from the $1,413 million reported in the
> fourth quarter of 2015, primarily resulting from a one-time sequential decline of
> $40 million in the recognition of regulatory revenue that was in line with
> previously disclosed expectations and a decline in voice services revenue.
> Frontier recognized Connect America Fund Phase II (CAF II) revenue for the first
> time in the second half of 2015, resulting in the majority of the full year CAF II
> revenue being recognized in the third and fourth quarters of 2015.
>
> **Customer revenue** for the first quarter of 2016 of $1,189 million decreased by
> $18 million, or 1%, from $1,207 million in the fourth quarter of 2015, primarily

due to a decline in voice services revenue. Total residential revenue was $583 million for the first quarter of 2016, compared to $594 million in the fourth quarter of 2015. Total business revenue was $606 million for the first quarter of 2016, compared to $613 million in the fourth quarter of 2015.

At March 31, 2016, Frontier had 3,088,300 residential customers. The first quarter of 2016 resulted in a net reduction of 1.1% of our residential customers, compared to a net reduction of 0.7% in the fourth quarter of 2015. The average monthly residential revenue per customer was $62.64 in the first quarter of 2016, a decrease of $0.50, or 0.8%, compared to the fourth quarter of 2015, due to the decline in voice services revenue.

At March 31, 2016, Frontier had 284,400 business customers. The first quarter of 2016 resulted in a net reduction of 1.7% of our business customers, similar to the fourth quarter of 2015. The average monthly business revenue per customer was $704.10, an increase of 0.6% over the fourth quarter of 2015, as the business customer decline continued to be driven by a decrease in the number of small business customers.

At March 31, 2016, Frontier had 2,486,700 broadband customers. We added 24,600 net broadband customers during the first quarter of 2016 compared to 28,500 net additions in the fourth quarter of 2015.

At March 31, 2016, Frontier had 543,400 video customers. The first quarter of 2016 resulted in a net reduction of 10,300 video customers, including a reduction of 6,700 satellite video customers, compared to the fourth quarter net reduction of 5,800 video customers, including a reduction of 5,400 satellite video customers.

\*   \*   \*

**Acquisition and integration costs** for the first quarter of 2016 were $138 million related to the Verizon transaction compared to $86 million in the fourth quarter of 2015.

**Operating income** for the first quarter of 2016 was $58 million and operating income margin was 4.3% compared to operating income of $182 million and operating income margin of 12.9% in the fourth quarter of 2015.

\*   \*   \*

**Net income/loss** was a net loss of $186 million, or $0.16 per share, in the first quarter of 2016, compared to a net loss of $103 million, or $0.09 per share, in the fourth quarter of 2015. The first quarter of 2016 included acquisition related interest expense of $188 million and acquisition and integration costs of $138 million (combined after-tax impact of $200 million, or $0.17 per share). Excluding the impact of these items, the non-GAAP adjusted net income for the

first quarter of 2016 was $14 million, or $0.01 per share, as compared to $56 million, or $0.05 per share, in the fourth quarter of 2015.

**Capital expenditures** for ongoing operations were $207 million for the first quarter of 2016 compared to $185 million for the fourth quarter of 2015. In addition, acquisition related capital expenditures were $52 million in the first quarter of 2016, similar to the fourth quarter of 2015.

\*       \*       \*

**2016 Full Year Guidance**

For the full year of 2016 including the impact of the California, Texas, and Florida acquisition, Frontier's expectation for adjusted free cash flow (as calculated per Schedule A) is in the range of $800 million to $925 million and for **capital expenditures** for Frontier's combined operations is in the range of $1,250 million to $1,400 million. Frontier expects 2016 cash taxes to be in the range of $5 million to $15 million.

54.     On May 5, 2016, the Individual Defendants caused Frontier to file its quarterly report on Form 10-Q for Q1 2016 (the "Q1 2016 10-Q"). The Q1 2016 10-Q reaffirmed the financial results announced in the May 2016 Press Release, and contained signed certifications pursuant to SOX by Defendants McCarthy and Jureller, which stated that the financial information contained in the Q1 2016 10-Q was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

55.     On August 1, 2016, the Individual Defendants caused Frontier to issue a press release (the "August 2016 Press Release"), also attached as exhibit 99.1 to the Form 8-K filed with the SEC, announcing the Company's Q2 2016 financial results. The August 2016 Press Release stated, in relevant part:

**Norwalk, Conn., August 1, 2016** – Frontier Communications Corporation (NASDAQ:FTR) today reported its financial results for the second quarter of 2016, which include contributions from the fully integrated assets Frontier acquired from Verizon in California, Texas, and Florida (CTF).

"We are very pleased with the performance of our newly acquired assets and our achievement of annualized cost synergies of $1 billion in the second quarter. We now expect annual cost synergies related to the acquisition of $1.25 billion, up

from our original estimate of $700 million," said Dan McCarthy, Frontier President and Chief Executive Officer.

"As we move forward, we are continuing to focus on executing our strategy for growth, including upgrading our broadband speed capabilities, expanding our new Vantage video service to an increasing portion of our footprint, and implementing our successful commercial distribution capabilities in Frontier's new markets. We will remain focused on increasing our broadband and video penetration, and improving our efficiency.  Our priorities continue to be driving strong free cash flow and continuing our disciplined capital allocation policy, which together underpin our very attractive, sustainable dividend, and industry-leading dividend payout ratio.  We also are very well-positioned to achieve our plan to reduce leverage over time," McCarthy said.

**Financial Highlights for the Second Quarter 2016:**

- Revenue of $2,608 million

- Operating income of $311 million, operating income margin of 11.9%

- Net loss of $80 million, or ($0.07) per share

- Adjusted EBITDA of $1,032 million, adjusted EBITDA margin of 39.6%

- Net cash provided from operating activities of $693 million

- Adjusted Free Cash Flow of $250 million

Revenue:

| | For the quarter ended | | | | |
| | June 30, 2016 | | | | |
| ($ in millions) | Consolidated Amount | CTF Operations | Frontier Legacy* | March 31, 2016 | June 30, 2015 |
|---|---|---|---|---|---|
| Total revenue | $      2,608 | $      1,282 | $      1,326 | $      1,355 | $      1,368 |

Revenue in the second quarter of 2016 associated with the CTF Operations reflected certain reductions to revenues previously reported for the business, including revenue that did not transfer over from Verizon and strategic decisions to terminate certain contracts and services which, while lowering revenues, added to EBITDA.  Revenues were also impacted by one-time items, including the temporary suspension of late fees, outage credits and the anticipated acquisition-related accounting changes.  Also, as previously announced, the Company temporarily suspended marketing activity which impacted customer additions. Mr. McCarthy commented, "We are pleased that the EBITDA from the acquired operations met our expectations for the quarter as a result of better-than-expected cost synergies, and despite our strategic decision to forego specific revenue opportunities."

Customers:

| | As of and for the quarter ended | | | |
| --- | --- | --- | --- | --- |
| | June 30, 2016 | | June 30, 2015 | |
| **Residential customer metrics:** | | | | |
| Customers (in thousands) | | 5,243 | | 3,175 |
| Average monthly residential revenue per customer | $ | 83.20 | $ | 64.43 |
| Customer monthly churn | | 1.91% | | 1.78% |
| **Business customer metrics:** | | | | |
| Customers (in thousands) | | 528 | | 299 |
| Average monthly business revenue per customer | $ | 658.00 | $ | 689.21 |
| **Broadband subscribers (in thousands)** | | 4,570 | | 2,406 |
| **Video subscribers (in thousands)** | | 1,628 | | 569 |

The broadband and video unit results during the second quarter reflect Frontier's previously-stated plans to suspend marketing during the second quarter to prospective new customers in the acquired CTF markets, enabling Frontier to focus its efforts on supporting existing customers in those markets. Marketing spending and engagement have now returned to normal levels and the Company anticipates improved customer additions in the third quarter and beyond. Residential ARPC increased during the second quarter largely as a result of the greater availability of video in the new CTF markets. Business ARPC decreased primarily due to the CTF markets having proportionally fewer wholesale customers relative to total business customers as compared to our legacy markets.

Integration Costs:

Frontier completed its CTF customer conversion activities in the second quarter and is finalizing the remainder of its integration work. During the second quarter, Frontier incurred $106 million of integration operating expenses and $36 million of integration capital expenditures. These costs were driven by cutover activities and the acceleration of certain projects to improve synergy attainment.

Cash Flow Highlights:

| | For the quarter ended | | | |
| --- | --- | --- | --- | --- |
| | June 30, 2016 | | June 30, 2015 | |
| Capital expenditures – business operations | $ | 350 | $ | 178 |
| Capital expenditures – integration activities | $ | 36 | $ | 28 |
| Dividends paid – preferred stock | $ | 53 | $ | - |
| Adjusted free cash flow[c] | $ | 250 | $ | 200 |
| Dividends paid – common stock | $ | 123 | $ | 106 |
| Dividend payout ratio[d] | | 49% | | 53% |

56.     On August 8, 2016, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q for Q2 2016 (the "Q2 2016 10-Q"). The Q2 2016 10-Q reaffirmed the financial results announced in the August 2016 Press Release, and contained signed certifications pursuant to SOX by Defendant Daniels, which stated that the financial

information contained in the Q2 2016 10-Q was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

57.     On November 1, 2016, the Individual Defendants caused Frontier to issue a press release (the "November 2016 Press Release"), also attached as exhibit 99.1 to the Form 8-K filed with the SEC, announcing the Company's Q3 2016 financial results.  The November 2016 Press Release stated, in relevant part:

**Norwalk, Conn., November 1, 2016** – <u>Frontier Communications Corporation</u> (NASDAQ:FTR) today reported its third quarter financial results and provided an update on its progress with the acquisition of Verizon's wireline properties in California, Texas, and Florida (CTF).

Dan McCarthy, President and CEO, stated, "I am pleased that we achieved third quarter adjusted EBITDA of $1 billion.  We are reaffirming our adjusted EBITDA guidance for the 4th quarter and outlook for 2017.  We are on course to improve our revenue performance, principally by returning to normal customer trends in the CTF market over the coming quarters."

Frontier today announced a new customer-focused organizational structure and the creation of Commercial and Consumer business units.  The updated structure will result in enhanced focus on the commercial segment and more efficient capital allocation.  Current regional support functions including Engineering, Finance, Human Resources, Communications and Marketing are being centralized to achieve improved operational performance as well as expense reductions.

Frontier's annualized cost synergy target is now $1.4 billion, up from the $1.25 billion target outlined in the second quarter earnings report.  Yet-to-be attained cost synergies of $400 million are anticipated to be achieved by mid-year 2019, including $250 million anticipated to be achieved by mid-year 2017.

Frontier's priorities continue to be driving strong free cash flow and continuing a disciplined capital allocation policy.  Frontier is committed to maintaining an attractive dividend, preserving its industry-leading dividend payout ratio, and reducing leverage.

**Financial Highlights for the Third Quarter 2016:**

- Revenue of $2,524 million

- Operating income of $264 million, operating income margin of 10.5%

- Net loss attributable to common shareholders of $134 million, or ($0.12) per share, and net loss of $80 million

- Adjusted EBITDA of $1 billion, adjusted EBITDA margin of 39.6%

- Net cash provided from operating activities of $321 million

- Adjusted Free Cash Flow of $168 million

Revenue:

| | | | | For the quarter ended | | |
| | September 30, 2016 | | | June 30, 2016 | | |
| (*$ in millions*) | Consolidated Amount | CTF Operations | Frontier Legacy | Consolidated Amount | CTF Operations | Frontier Legacy |
|---|---|---|---|---|---|---|
| Total revenue | $ 2,524 | $ 1,212 | $ 1,312 | $ 2,608 | $ 1,282 | $ 1,326 |

Revenues from CTF Operations were impacted by a slower than expected recovery of FiOS® gross additions and an increased accounts receivable reserve associated with the resumption of normal customer collection activities. In addition, second quarter results included the one-time benefit of a true-up of CAF II revenues for the acquired states that did not recur in the third quarter.

Customers:

| | As of and for the quarter ended | | | |
| | September 30, 2016 | | June 30, 2016 [4] | |
|---|---|---|---|---|
| **Residential customer metrics:** | | | | |
| Customers (in thousands) | | 5,073 | | 5,228 |
| Average monthly residential revenue per customer | $ | 82.34 | $ | 83.20 |
| Customer monthly churn | | 2.08% | | 1.91% |
| **Business customer metrics:** | | | | |
| Customers (in thousands) | | 516 | | 528 |
| Average monthly business revenue per customer | $ | 668.30 | $ | 658.00 |
| **Broadband subscribers (in thousands)** | | 4,404 | | 4,503 |
| **Video subscribers (in thousands)** | | 1,526 | | 1,618 |

The broadband and video unit results during the third quarter reflected the initiation of customer acquisition activities within the quarter in the acquired CTF markets. Frontier anticipates improved customer additions in the fourth quarter.

Integration Costs:

During the third quarter, Frontier incurred $122 million of integration operating expenses and $11 million of integration capital expenditures.

Guidance:

For the full year 2016, Frontier expects:

- Adjusted Free Cash Flow – between $920 million and $950 million

- Capital Expenditures – between $1,250 million and $1,275 million

- Cash Taxes – refund between $100 million and $110 million

For the fourth quarter of 2016, Frontier expects:

- Adjusted EBITDA – at least $1 billion

58.     On November 3, 2016, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q for Q3 2016 (the "Q3 2016 10-Q").  The Q3 2016 10-Q reaffirmed the financial results announced in the November 2016 Press Release, and contained signed certifications pursuant to SOX by Defendant Daniels, which stated that the financial information contained in the Q3 2016 10-Q was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

59.     On February 27, 2017, the Individual Defendants caused Frontier to issue a press release (the "February 2017 Press Release"), also attached as exhibit 99.1 to the Form 8-K filed with the SEC, announcing the Company's Q4 2016 and fiscal year 2016 financial results.  The February 2017 Press Release stated, in relevant part:

- Adjusted EBITDA of $966 million and ***net loss of $80 million in the fourth quarter***

- Full-year adjusted free cash flow of $921 million, with full year net cash provided by operating activities of $1,666 million

- ***Fourth quarter results impacted by resolution of non-paying acquired CTF accounts***

- Improved trend in broadband in both Legacy and CTF markets, excluding impact of non-paying account resolution

- Increased annualized cost synergy target to $1.6 billion, with $1.25 billion to be realized by end of Q1 2017, and $1.6 billion by end of Q2 2018

- Amended April 2021 term loan and revolver to provide more flexible terms, and upsized and extended revolver

- Board of Directors approved and will recommend to stockholders a reverse stock split

- Dividend payout ratio of 52% in 2016

- Provides 2017 guidance for adjusted free cash flow, capital expenditures, and cash taxes

**Norwalk, Conn., February 27, 2017** – <u>Frontier Communications Corporation</u> (NASDAQ:FTR) today reported its fourth quarter and full year 2016 results and provided an update on its progress with its wireline properties acquired from Verizon in California, Texas, and Florida.

Dan McCarthy, President and CEO, stated, "During the quarter we made significant progress in positioning our company to deliver a better customer experience and improved financial performance, with greater financial flexibility. Our reorganization into separate Commercial and Consumer business units will result in a more customer-centric approach, while reducing expenses and enabling more efficient capital deployment.  We now expect annualized cost synergies of $1.6 billion to be achieved by mid-year 2018, up from the $1.4 billion target outlined in the 2016 third quarter earnings report, and a full year earlier than anticipated.  We expect $1.25 billion of the $1.6 billion in synergies will be achieved by the end of the first quarter of 2017, which is a quarter earlier than previously announced."

Mr. McCarthy continued: "***Results for the fourth quarter were impacted by our intensified efforts to resolve acquired accounts in California, Texas and Florida that we have determined to be non-paying.***  This process is almost complete, and we expect to return to a normalized trend by the start of the second quarter.  I am pleased that underlying CTF customer trends improved in Q4 and continue to improve in Q1."

McCarthy continued, "We are taking action to adapt our organization to the opportunities created by the increased scale and scope we recently acquired, to invest wisely in the business, and to improve our financial flexibility.  We remain committed to delivering shareholder value going forward, by improving revenue trends and managing expenses to provide healthy free cash flow and maintain our quarterly common dividend through a sustainable payout ratio."

<u>Financial Highlights for the Fourth Quarter 2016</u>

- Revenue of $2,409 million

- Operating income of $255 million; operating margin of 10.6%

- Net loss attributable to common shareholders of $133 million, or ($0.12) per share, and net loss of $80 million

- Adjusted EBITDA of $966 million; Adjusted EBITDA margin of 40.0%

- Net cash provided from operating activities of $714 million

- Adjusted free cash flow of $316 million

60.     On the same day, February 27, 2017, the Company held a conference call (the "Q4/FY 2016 Call") to discuss its Q4 2016 and fiscal year 2016 financial results.  On the Q4/FY 2016 Call, Defendant McCarthy stated:

> We have provided a time line of the account cleanup issue.  As you can see, in anticipation of the deal close, Verizon stopped treatment of overdue accounts on February 1, 2016.  We continued non-treatment of these accounts through July 20, as we worked through the cut over.
>
> We have been working through the account cleanup process since July 20.  We began disconnecting non-paying accounts at the end of August and continued this through Q1.
>
> From an accounting standpoint, we began to reserve aging accounts in accordance with our normal policies in Q2 and then increased our reserves, as we discussed on the last earnings call.  We began permanent disconnects and receivable write-offs in 3Q, continued them in 4Q and expect to complete them this month.
>
> Turning to slide 6, CTF account cleanup had a $45 million impact on fourth quarter revenue and we estimate less than a $25 million impact in first quarter revenue.  We do not expect any further account cleanup impact beyond the first quarter, and we are now operating normally with respect to the acquired customer receivable.
>
> We completed this cleanup process this month.  This was due to the backlog and the specific rules and customer treatment processes dictated by relevant franchising authorities.  We are taking steps to more aggressively manage costs in light of the longer timeframe needed to clean up this account group.

61.     On March 28, 2017, the Individual Defendants caused Frontier to file a proxy statement with the SEC, pursuant to Section 14(a) of the Exchange Act (the "2017 Proxy").  The 2017 Proxy described director responsibilities, the duties of each committee, Board risk management, and provided information about the director nominees up for reelection.  However, the 2017 Proxy misrepresented and/or failed to disclose that (i) Frontier had inadequate corporate

– 30 –

accounting and corporate financial reporting resources; (ii) Frontier inadequately assessed the risks associated with the Company's financial reporting; (iii) Frontier failed to maintain effective internal controls over financial reporting; and (iv) as a result of the foregoing, Frontier's public statements were materially false and misleading at all relevant times.

**REASONS THE INDIVIDUAL DEFENDANTS' STATEMENTS
WERE FALSE AND MISLEADING**

62.     The statements identified above in ¶¶36–60 made or caused to be made by the Individual Defendants, were materially false and/or misleading because they misrepresented and failed to disclose material, adverse facts concerning the Company's business, operational, and compliance policies, which were known to the Individual Defendants or recklessly disregarded by them.  Specifically, the Individual Defendants made, or caused to be made, false and/or misleading statements and/or failed to disclose that: (i) the Company acquired a substantial number of non-paying accounts as part of its acquisition of the wireline operations of Verizon; (ii) as a result, the Company would be required to increase its reserves, and write-off amounts from accounts receivable associated with the non-paying accounts; (iii) Frontier had inadequate corporate accounting and corporate financial reporting resources; (iv) Frontier inadequately assessed the risks associated with the Company's financial reporting; (v) Frontier failed to maintain effective internal controls over financial reporting; and (vi) as a result of the foregoing, Frontier's public statements were materially false and misleading, and/or lacked a reasonable basis at all relevant times.  As a result of their fraudulent scheme, the Individual Defendants were able to artificially inflate the Company's financials, and its stock price, throughout the Relevant Period.

## THE TRUTH IS REVEALED

63.    On May 2, 2017, the Individual Defendants caused Frontier to issue a press release (the "May 2017 Press Release"), also attached as exhibit 99.1 to the Form 8-K filed with the SEC, announcing the Company's Q1 2017 financial results.   The May 2017 Press Release stated, in relevant part:

- Adjusted EBITDA of $923 million and quarterly Net Loss of $75 million

- Third sequential quarter of improved FiOS® gross adds in CTF markets

- Resolution of non-paying CTF accounts completed, in line with previous disclosures

- Achieved target of $1.25 billion in total annualized synergies by end of Q1 2017, and remain on track to deliver an additional $350 million by end of Q2 2018

- Board revises capital allocation strategy, including reducing the quarterly dividend to $0.04 per share and accelerating the pace of debt and leverage reduction

**Norwalk, Conn., May 2, 2017** – Frontier Communications Corporation (NASDAQ:FTR) today reported its first quarter 2017 results, and announced that the Board of Directors has revised the Company's capital allocation strategy, which includes a reduction in the quarterly dividend to $0.04 per share, to enhance financial flexibility and achieve a targeted leverage ratio of 3.5x by year-end 2021, down from the current ratio of 4.39x.

Dan McCarthy, President and CEO, stated, "During the quarter, we continued to realize our targeted efficiencies and synergies, and I am also pleased to have achieved our third consecutive quarter of improved FiOS gross additions in the California, Texas and Florida (CTF) markets.  We are executing on a number of initiatives with the goal of enhancing customer experience, reducing churn, stabilizing revenues and generating cash flow.

"Our Board regularly reviews the Company's long-term capital allocation strategy, and it has determined to reduce the dividend at this time to provide additional financial flexibility, while still returning a meaningful cash dividend to shareholders.  As we continue to execute on our strategy to deliver on the full potential of our strong assets and generate additional cash flow, we will optimize our capital allocation to ensure we strike a balance between investing in the business, paying down debt and returning capital to shareholders," said McCarthy.

**Business Highlights**

- Frontier achieved a third consecutive quarter of growth in broadband gross additions in its CTF markets, which was driven by the first full quarter of robust marketing

- Overall, consumer churn was elevated during the quarter, and to address this Frontier is investing in a number of initiatives that will improve customer care, retention and acquisition, including:

  o Implementation of Pega® platform underway that will integrate back-office systems to allow Frontier to transform customer experience management, marketing and cost-to-serve

  o Launched e-commerce platform in April to create additional sales channel, improve customer experience and reduce call center volume

  o Expanding network capacity to relieve network congestion

- Increased CAF II households by over 27,000, plus another 82,000 households in adjacent areas

- Completed redeployment of commercial salesforce to align with network and market opportunity

64.    On the same day, May 2, 2017, the Company held a conference call (the "Q1 2017 Call") to discuss its Q1 2017 financial results.  On the Q1 2017 Call, Defendant McBride stated:

First quarter revenue of $2.36 billion declined $53 million from the $2.41 billion reported in the fourth quarter of 2016.  Approximately $16 million of the sequential decline in revenue was a result of the previously disclosed cleanup of CTF non-paying accounts and the automation of legacy non-pay disconnects.  The cleanup and automation processes have now been completed.

\*     \*     \*

Customer revenue of $2.16 billion was down $51 million or 2.3% sequentially from the fourth quarter of 2016.  As previously disclosed, first quarter revenue was impacted by the final cleanup of the CTF non-paying accounts and the automation of the legacy non-pay disconnect process. The CTF account cleanup reduced Q1 revenue by $11 million, and the one-time impact related to automating the non-pay disconnect process for the legacy properties reduced Q1 revenue by $5 million.  As stated earlier, these are now complete.

65.     Following the release of this news, Frontier's share price declined $0.32 per share (more than 16%), on unusually heavy trading volume, from $1.93 on May 2, 2017 to $1.61 per share on May 3, 2017.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.     Fiduciary Duties

66.     By reason of their positions as officers, directors, and/or fiduciaries of Frontier, and because of their ability to control the business and corporate affairs of Frontier, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Frontier in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of Frontier and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

67.     Each director and officer of the Company owed, and owes, to Frontier and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

68.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Frontier, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Frontier, each of the Individual Defendants had knowledge of material, non-public information regarding the Company.  In addition, as officers and/or directors of a publicly-held company, the Individual Defendants had a duty to promptly

disseminate accurate and truthful information with regard to the Company's business, operations, and financial prospects so that the market price of the Company's stock would be based on truthful and accurate information.

69. To discharge their duties, the officers and directors of Frontier were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Frontier were required to, among other things:

(a) exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner, so as to make it possible to provide the highest quality performance of their business;

(b) exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner, and in compliance with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

(c) when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

### B.  Audit Committee Duties

70. In addition to these duties, the members of the Audit Committee owed specific duties to Frontier under the Audit Committee's Charter (the "Charter").  According to the Charter, the Audit Committee is responsible for the following:

> The Committee is responsible for oversight of the Company's independent auditors who shall report directly to the Committee. The Committee shall assist the Board in undertaking and fulfilling its responsibilities in overseeing (i) the integrity of the financial statements of the Company, (ii) the accounting and

financial reporting processes of the Company and the audits of the financial statements of the Company, (iii) the Company's compliance with legal and regulatory requirements, (iv) the independence, qualifications and performance of the Company's independent auditors, and (v) the qualifications and performance of the Company's internal audit function.  The Committee shall report regularly to the Board.  The Committee shall prepare all reports concerning this Charter and the activities of the Committee required by regulations of the Securities and Exchange Commission (the "SEC") or NASDAQ.  In discharging its oversight role, the Committee is empowered to investigate any matter brought to its attention with full access to all books, records, facilities, and personnel of the Company and the authority to engage independent counsel and other advisors as it determines is necessary to carry out its duties.

71.     Specifically, according to the Charter, and as reiterated in the Company's 2015, 2016, and 2017 Proxy Statements, the Audit Committee's responsibilities include the following:

1.     Appoint, subject to non-binding stockholder ratification (and, if appropriate dismiss), evaluate, compensate and oversee (taking into account the opinions of management and the Company's internal auditor, where appropriate) the work of the independent auditor, who shall report directly to the Committee.

2.     Meet with the independent auditors prior to the audit to review the scope, planning and staffing of the audit and approve in advance any audit and permitted non-audit services (including the estimated fees and terms thereof) to be provided by the independent auditor, and such other matters pertaining to such audit as the Committee may deem appropriate (with pre-approvals disclosed as required in the Company's periodic public filings).

3.     Review a report by the independent auditors at least annually, describing: (i) the independent auditor's internal quality-control procedures; (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the independent auditors or the review of the independent auditors by the Public Company Accounting Oversight Board, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the independent auditors, and any steps taken to deal with any such issues; and (iii) all relationships between the independent auditors and the Company which may relate to the auditors' independence.

4.     On an annual basis: (i) consider the independence of the independent auditors, including whether the provision by the independent auditor of permissible non-auditing services is compatible with independence; (ii) review a formal written statement from the independent auditor delineating all relationships between the independent auditor and the

Company, consistent with Public Company Accounting Oversight Board Rule 3526 (as modified or supplemented), engage in a dialogue with the independent auditor with respect to any disclosed relationships or services that may impact its objectivity and independence and take, or recommend that the Board take, appropriate action in response to the independent auditor's report to satisfy itself of the auditor's independence; (iii) participate in the selection of, evaluate, and assure the regular rotation of, the lead audit partner as required by law, and consider whether, in the interest of assuring continuing independence of the independent auditor, the Company should regularly rotate its independent auditor.

5.   Set clear hiring policies for employees or former employees of the independent auditors, review on a periodic basis and revise as necessary.

6.   Review with management, the internal auditors and the independent auditors: (i) any significant findings during the year, including the status of previous audit recommendations; (ii) problems or difficulties encountered in the course of the audit work, including restrictions on the scope of activities or access to required information and disagreements with management; (iii) any changes required in the scope of the audit plan; (iv) the audit budget and staffing; (v) the coordination of audit efforts in order to monitor completeness of coverage, reduction of redundant efforts, and the effectiveness of audit resources; (vi) accounting adjustments that were noted or proposed by the independent auditors and that were "posted" or "passed" (as immaterial or otherwise); and (vii) any management letter proposed to be issued, by the independent auditors.

7.   Oversee the resolution of disagreements between management and the independent auditors regarding financial reporting.

8.   Meet to review and discuss with management, the independent auditors and the internal auditors the quality and adequacy of the Company's financial reporting processes, internal controls and disclosure controls and procedures, including whether there are any significant deficiencies in the design or operation of such processes, controls and procedures, material weaknesses in such processes, controls and procedures, any corrective actions taken with regard to such deficiencies and weaknesses and any fraud involving management or other employees with a significant role in such processes, controls and procedures.

9.   Review the Company's financial statements, including: (i) prior to public release, reviewing with management and the independent auditor the Company's annual and quarterly financial statements to be filed with the SEC, including (a) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," (b) any certifications regarding the financial statements or the Company's internal accounting and financial controls and procedures and

disclosure controls and procedures filed with the SEC by the Company's senior executive and financial officers and (c) the matters required to be discussed with the independent auditor by the applicable Statement of Auditing Standards (or successor provisions); (ii) with respect to the independent auditor's annual report and certification, before release of the annual audited financial statements, meeting separately with the independent auditor without any management member present and discussing the adequacy of the Company's system of internal accounting and financial controls and the appropriateness of the accounting principles used in and the judgments made in the preparation of the Company's audited financial statements and the quality of the Company's financial reports; (iii) meeting separately, periodically, with management, with internal auditors (or other personnel responsible for the internal audit function) and with the independent auditor; and (iv) making a recommendation to the Board regarding the inclusion of the audited annual financial statements in the Company's Annual Report on Form 10-K to be filed with the SEC.

10.    Review with management and the independent auditor any material financial or non-financial arrangements that do not appear on the Company's financial statements that are brought to the attention of the Committee.

11.    Prepare a report to be included in the Company's annual proxy statement stating whether or not the Committee: (i) has reviewed the audited financial statements with management; (ii) has discussed with the independent auditor the matters required to be discussed by the applicable Statement of Auditing Standards (or successor provisions); (iii) has received the written disclosure and letter from the independent auditor (delineating all relationships it has with the Company) and has discussed with the independent auditor its independence; and (iv) based on the review and discussions referred to above, the members of the Committee recommended to the Board that the audited financials be included in the Company's Annual Report on Form 10-K for filing with the SEC.

12.    Review analyses prepared by management or the independent auditor of significant accounting and financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including: (i) analyses of all critical accounting policies and practices used; (ii) off-balance sheet financial structures; (iii) the effects of GAAP methods on the Company's financial statements, and of non-GAAP financial information, including the use of "pro forma" or "adjusted" financial data included in financial reporting; and (iv) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles.

13.     Review matters that have come to the attention of the Committee through reports to the Committee from management, legal counsel, and others, that relate to the status of compliance or disclosure with laws, regulations, internal policies and controls, and that may be expected to be material to the Company's financial statements.

14.     Review with management and the independent auditor the potential effect of regulatory and accounting initiatives on the Company's financial statements.

15.     Review with management and the independent auditor any correspondence with regulators or governmental agencies and any employee complaints or published reports that raise material issues regarding the Company's financial statements or accounting policies.

16.     Review with management the Company's earnings press releases, as well as financial information and any guidance provided to analysts and ratings agencies, including the use of "pro forma" or "adjusted" financial data. Such review may be done generally (consisting of reviewing the types of information to be disclosed and the types of presentations to be made) and need not be in advance of each earnings release or each instance in which the Company provides any guidance.

17.     Discuss with the Company's General Counsel legal matters that may have a material impact on the Company's financial statements or compliance policies.

18.     Review and discuss with management, the senior internal auditor, and the independent auditor: (i) the guidelines for the internal controls over financial reporting; (ii) reportable conditions that are identified in the implementation of the internal controls; (iii) the occurrence of fraud (whether material or not) that involves management or other employees of the Company who have a significant role in internal control over financial reporting; (iv) significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data; and (v) any significant audit steps adopted in light of such control deficiencies.

19.     Review the appointment and replacement of the Chief Financial Officer, the Chief Accounting Officer (or such other officer acting as the principal accounting officer), the Compliance Committee Chair, and the senior internal auditor.

20.     Review and discuss with management, the internal auditor and the independent auditor (i) the guidelines and policies to govern the process by which the Chief Executive Officer and senior management assess and manage the Company's exposure to risk, including the Company's

Enterprise Risk Management process and (ii) the Company's major financial, operational and reputational risk exposures and the steps management has taken to monitor and control such exposures and advise the Board with respect to such exposures.

21.     Review reports from management, the Company's senior internal auditor, and the independent auditor regarding the Company's compliance with applicable legal requirements and the Company's Code of Ethics. Advise the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and with the Company's Code of Ethics.

22.     Approve procedures for the treatment of complaints received by the Company regarding accounting, internal controls over financial reporting or auditing matters. Establish procedures for (i) the receipt, retention and treatment of complaints from employees on accounting, internal accounting controls or auditing matters and (ii) the confidential, anonymous submissions by Company employees of comments regarding questionable accounting or auditing matters.

23.     Review management expense accounts and perquisites, including management's use of corporate assets, and consider the results of the review of these areas, including compliance with policies and procedures, with the senior internal auditor or the General Counsel.

24.     Review with the senior internal auditor, at least quarterly, plans, activities, staffing and organizational structure to ensure effectiveness and independence of the function.

25.     Review and approve the annual internal auditing budget and assess the appropriateness of resources allocated to internal auditing.

26.     Approve, through the Chairman of the Committee, the performance evaluation and compensation decisions related to the senior internal auditor.

27.     Conduct an annual performance evaluation of the Committee.

28.     Review this Charter annually in light of the operations and responsibilities of the Committee and recommend to the Board amendments as the Committee deems appropriate.

29.     Undertake such additional activities within the scope of its functions as the Committee may from time to time determine or as may otherwise be required by law, the Company's Bylaws, Certificate of Incorporation or the Board.

30.     Report regularly to the Board on (i) any issues that arise with respect to the quality or integrity of the Company's financial statements, the accounting and financial reporting processes and audits of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors, or the performance of the internal audit function and (ii) on any other matters the Committee deems appropriate or the Board requests.

31.     Maintain written minutes of Committee meetings and other records of activities to be duly filed in the Company records, and make reports of meetings of the Committee to the Board at its next regularly scheduled meeting.

72.     Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

**C.     Duties Pursuant to the Company's Code of Business Conduct and Ethics**

73.     The Individual Defendants, as officers and/or directors of Frontier, were also bound by the Company's Code of Business Conduct and Ethics (the "Code") which, according to the Code, sets out basic principles to guide all directors, officers, and employees of Frontier, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

74.     With respect to investigations and audits, the Code requires that "[i]f you observe or become aware of what seems to be illegal, unethical, or inappropriate behavior, or if you have accounting or auditing concerns, you must report the behavior and fully cooperate in any internal investigation."

75.     With respect to the accuracy of financial records, the Code states:

The reliability of Frontier's financial records must be beyond question. All of our books, records, accounts, and financial statements must be timely and reasonably detailed. Each document must completely and accurately reflect our assets, liabilities, and transactions.

Frontier expects us all to be watchful and accurate when producing or reviewing any financial records to ensure they meet the Company's internal standards, Generally Accepted Accounting Principles, and all regulatory requirements. We never make or approve a document that intentionally obscures or improperly records a transaction.

76.     In addition to the Code, the Company also maintains a Specific Code of Business Conduct and Ethics Provisions for Certain Officers (the "Specific Code"), which bound Frontier's principal executive officer, principal financial officer, principal accounting officer or controller, and persons performing similar functions. According to the Specific Code, its purpose is to deter wrongdoing and to promote the following:

- Full, fair, accurate, timely, and understandable disclosure in our filings with, or submissions to, the Securities and Exchange Commission ("SEC") and in other public communications made by the Company;

- Compliance with applicable governmental laws, rules and regulations;

- Prompt internal reporting to the Board or any Board committee overseeing the specific provisions of this Code or violations of the specific provisions (the "Board Committee"); and

- Accountability for adherence to the specific provisions. This Policy should be read in conjunction with all other Frontier policies, including the Code of Business Conduct and Ethics.

77.     The Specific Code also provides that its officers shall be subject to the following rules and requirements:

Each Officer is expected to conduct his or her affairs with uncompromising honesty and integrity. Each Officer is required to adhere to the highest standards, regardless of local custom. An Officer is expected to be honest and ethical in dealing with all or our Employees, customers, suppliers, and third parties. The actions of an Officer must be free from illegal behavior including, without limitation, discrimination, libel, slander or harassment. Each Officer is expected to avoid engaging in activities that conflict with or have the appearance of conflicting with the best interests of Frontier and its stockholders. Prompt and full disclosure is always the correct first step towards identifying and resolving any potential conflict of interest. The Board or the Board Committee will review any conflict involving an Officer (other than the Chief Executive Officer). The Board will review any conflict involving the Chief Executive Officer.

Each Officer must endeavor to ensure full, fair, accurate, timely and understandable disclosure in reports and documents that we file with, or submit to, the SEC, as well as in our other public communications. Each Officer must read each SEC report and material press release prior to the time it is filed, furnished or issued to the SEC or the public, as applicable. Any inaccuracy or material misstatement in, or the omission from any SEC filing or press release of any information necessary to make the statements made not misleading, must be immediately disclosed to the Board and, if applicable, our auditors and legal counsel.

Each Officer must comply with applicable governmental laws, rules and regulations.

If an Officer becomes aware of a violation of the provisions of this section, such Officer must report the matter immediately to the Board or the Board Committee. It is the policy of the Company not to allow retaliation for reports of alleged violations that are made in good faith by Employees of the Company. Officers are required to fully cooperate in investigations concerning violations of these specific provisions.

Only the Board or the Board Committee may make any waiver of the specific provisions of this section. The Board or the Board Committee will promptly disclose waivers of the specific provisions of this section to the extent required by applicable law, including the rules and regulations promulgated by the SEC.

Any Officer who violates the specific provisions of this section will be subject to disciplinary action up to and including dismissal. If an Officer is in a situation that he or she believes may violate or lead to a violation of the specific provisions of this section, such Officer must contact a member of the Board or the Board Committee as soon as possible.

78.     Upon information and belief, the Company maintained versions of the Code and the Specific Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**D.      Control, Access, and Authority**

79.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Frontier, were able to, and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Frontier.

80.     Because of their advisory, executive, managerial, and directorial positions with Frontier, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Frontier.

81.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Frontier, and was at all times acting within the course and scope of such agency.

**E.     Reasonable and Prudent Supervision**

82.     To discharge their duties, the officers and directors of Frontier were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Frontier were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest-quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide shareholders and analysts as to the true business practices, operations, and financial prospects of the Company at any given time, including making accurate statements about the Company's business practices, operations, and financial prospects, as well as its internal controls;

(d)      remain informed as to how Frontier conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices, and make such disclosures as necessary to comply with securities laws;

(e)      refrain from trading on material, adverse, non-public information; and

(f)      ensure that Frontier was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

83.      The conduct of the Individual Defendants complained of herein involves knowing and culpable violations of their obligations as officers and/or directors of Frontier, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

84.      The Individual Defendants breached their duties of loyalty and good faith by allowing the other Individual Defendants to deceive, or by themselves deceiving, the investing public and artificially inflating and maintaining the market price of Frontier's securities by making, or causing to be made, untrue statements and omissions about Frontier's business, operational, and compliance policies, including that (i) the Company acquired a substantial number of non-paying accounts as part of its acquisition of the wireline operations of Verizon; (ii) as a result, the Company would be required to increase its reserves, and write-off amounts from accounts receivable associated with the non-paying accounts; and (iii) as a result of the foregoing, Frontier's public statements were materially false and misleading at all relevant times.

85.     The Individual Defendants also violated, or failed to prevent others from violating, federal securities laws, which have resulted in, and exposed the Company to, the Securities Class Actions.  As a result of these and other breaches of fiduciary duties, Frontier has expended, and will continue to expend, significant sums of money.

86.     Thus, the Individual Defendants, because of their positions of control and authority as officers and/or directors of Frontier, were able to, and did, directly, and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company, which resulted in substantial harm to Frontier.

87.     Specifically, as members of the Audit Committee, Defendants Barnes, Ferguson, Fraioli (Chair), and Schrott breached their fiduciary duties of good faith and loyalty by, *inter alia*, failing to implement sufficient internal controls and procedures and/or recklessly and indifferently failing to follow internal controls and procedures to ensure the accuracy of the Company's public statements.  Because of this failure, the Company issued false and misleading statements concerning the Company's business practices, operations, and financial prospects.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

88.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

89.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually

were.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

90.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, corporate waste, unjust enrichment, and violations of the federal securities laws; and (b) disguise and misrepresent the Company's actual business and financial prospects.

91.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

92.     Each of the Individual Defendants aided and abetted, and rendered substantial assistance, in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and in furtherance of the wrongdoing.

## DAMAGES TO FRONTIER

93.     As a result of the Individual Defendants' wrongful conduct, Frontier conducted its affairs in evident violation of federal and state laws and regulations.  In addition, the Company was caused to disseminate false and misleading statements, and to omit material information to

make such statements not false and misleading when made.  This misconduct has devastated Frontier's credibility.  Further, Frontier is the subject of the Securities Class Actions.  Frontier has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

94.     As a direct and proximate result of the Individual Defendants' actions as alleged above, Frontier's market capitalization has been substantially damaged, having lost over $5.8 billion dollars in value as a result of the conduct described herein.

95.     Further, as a direct and proximate result of the Individual Defendants' conduct, Frontier has expended, and will continue to expend, significant sums of money.   Such expenditures include, without limitation:

a)     costs incurred in investigating and defending Frontier and certain officers in the Securities Class Actions, plus potentially tens of millions of dollars in settlement or to satisfy an adverse judgment;

b)     costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based, at least in part, on Frontier's artificially-inflated stock price; and

c)     costs incurred from the loss of the Company's customers' confidence in Frontier and its products and services.

96.     Moreover, these actions have irreparably damaged Frontier's corporate image and goodwill.  For at least the foreseeable future, Frontier will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Frontier's ability to raise equity capital or debt on favorable terms in the future is now impaired.  The Company has also suffered a loss

of approximately $5.8 billion in market capitalization as a direct result of the Individual Defendants' wrongdoing alleged herein.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

97.     Plaintiff brings this action derivatively, in the right and for the benefit of Frontier, to redress injuries suffered, and to be suffered, by Frontier as a direct result of the Individual Defendants' breaches of fiduciary duties and other violations of law.  Frontier is named as a nominal defendant solely in a derivative capacity.

98.     Plaintiff will adequately and fairly represent the interests of Frontier in enforcing and prosecuting its rights.

99.     Plaintiff is and has continuously been a Frontier shareholder since prior to the start of the Relevant Period, and has been a shareholder at all relevant times, including at the time of the Individual Defendants' wrongdoing complained of herein.

100.     Plaintiff has not made a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act.

101.     Plaintiff has not made any demand on shareholders of Frontier to institute this action because such a demand would be a futile and useless act for the following reasons:

(a)     Frontier is a publicly-traded company with hundreds, if not thousands of shareholders, with approximately 78.52 million shares outstanding as of October 24, 2017;

(b)     making a demand on such a number of shareholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, and/or phone numbers of Frontier shareholders; and

(c)     making demand on all shareholders would force Plaintiff to incur excessive expense and obstacles, assuming all shareholders could even be individually identified with any degree of reasonable certainty.

102.    The Company has been directly and substantially injured by reason of the Individual Defendants' breaches of their fiduciary duties owed to Frontier.  Plaintiff, as a shareholder of Frontier, seeks damages and other relief on behalf of the Company, in an amount to be proven at trial.

103.    At the time this action was commenced, the Board of Frontier consisted of the following ten (10) directors: Director Defendants Barnes, Bynoe, Ferguson, Fraioli, McCarthy, Reeve, Ruesterholz, Schrott, Shapiro, and Wick.  Each of these ten individuals is, or would be, incapable of independently and disinterestedly assessing a shareholder's demand to bring the legal claims set forth herein.  Because Defendants Barnes, Bynoe, Ferguson, Fraioli, McCarthy, Reeve, Ruesterholz, Schrott, Shapiro, and Wick constituted a majority (indeed, the entirety) of Frontier's Board when this action was initiated on October 25, 2017, demand is excused as futile.

**A.     Demand is Futile as to the Director Defendants Because They Face a Substantial Likelihood of Liability in Connection with the Unlawful Conduct, Including the False and Misleading Financial Statements, Alleged Herein**

104.    Each of the Director Defendants faces a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith, and other misconduct.  The Director Defendants were directors throughout the Relevant Period, and as such, had fiduciary duties to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its financial and business prospects were truthful, accurate, and complete.

105.    Indeed, the Director Defendants were responsible for reviewing and approving the Company's financial statements.   By authorizing the false financial statements and public statements alleged herein, which were made beginning on February 5, 2015 by authorizing the February 2015 Press Release (and the contemporaneous filing thereof with the SEC upon Form 8-K), and other financial statements made with the SEC during the Relevant Period, and by failing to correct other statements the Officer Defendants made during such time, the Director Defendants were active participants in breaches of duties of good faith, candor, and loyalty, and have subjected the Company to lawsuits claiming violations of the federal securities laws.   A director's breach of the duty of candor is not entitled to protection under the business judgment rule.   As a result, any demand upon the Director Defendants to bring suit against themselves or the Officer Defendants would be a useless and futile act.

106.    The Director Defendants caused and/or allowed the Company to engage in the unlawful conduct alleged herein, and each of the Director Defendants faces a substantial likelihood of liability for causing Frontier to engage in such unlawful conduct.   As is described above, the Director Defendants either knew and caused, or were reckless in not knowing, the false and misleading nature of the public statements and/or omissions alleged herein.   The business judgment rule protects a wide variety of business decisions, but does not protect a corporation's officers and directors from causing a company to engage in illegal and unlawful conduct.

107.    As a result of the unlawful conduct described above, Defendants Barnes, Bynoe, Ferguson, Fraioli, McCarthy, Reeve, Ruesterholz, Schrott, Shapiro, and Wick (i.e., the entirety of the Board) face a substantial likelihood of liability for their breaches of fiduciary duties,

rendering any demand upon them futile.  Moreover, this conduct is not entitled to the protections of the business judgment rule, which also independently excuses demand.

108.    Additionally, the Director Defendants were specifically responsible for ensuring that Frontier had adequate internal controls regarding the Company's compliance with federal and state rules and regulations.  Thus, the Director Defendants are directly responsible for Frontier's failure to adopt and implement such internal controls, and for the substantial damages Frontier is subject to in the ongoing Securities Class Actions.  As such, all the Director Defendants face a substantial likelihood of liability for the claims asserted herein.  Demand is therefore futile.

109.    Indeed, the Director Defendants, knowingly and/or with reckless disregard for the truth, reviewed, authorized, and/or caused the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially-inflated prices.

110.    The Director Defendants' making (or authorization of) false and misleading statements throughout the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste and abuse of control, constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of Frontier to recover damages sustained as a result of this misconduct,

they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile.

**B.**     **Demand is Futile as to the Audit Committee Defendants because they Face a Substantial Likelihood of Liability for Consciously Disregarding the Company's Lack of Internal Controls Over Financial Reporting**

111.     During the Relevant Period, Defendants Barnes, Ferguson, Fraioli (Chair), and Schrott served as members of the Audit Committee.  The allegations set forth in this Complaint establish a substantial likelihood of liability for each of the Audit Committee Defendants for breach of the fiduciary duties of loyalty, good faith, due care, full and fair disclosure, and oversight.   Each of the Audit Committee Defendants consciously knew—or consciously disregarded the risk—that Frontier's internal controls were either inadequate or nonexistent, that its financial reporting was therefore inaccurate, and that, as a result, the Company's results were materially overstated.

112.     The Audit Committee was required to conduct a plenary review with management and the independent accountants of all quarterly and annual results *before* any such statements were issued.  The Audit Committee also was tasked with: overseeing the Company's accounting practices, internal controls, audit processes, and financial reporting processes; carefully monitoring and ensuring the Company's compliance with all applicable laws, regulations, and Company policies, procedures and controls; and reviewing and ensuring the adequacy of all of the Company's financial-reporting processes and disclosure controls and processes, among other duties set forth in the Audit Committee Charter.

113.     However, the Audit Committee Defendants consciously, or at least recklessly, disregarded these duties and responsibilities, in violation of their fiduciary duties to Frontier by, among other things: (i) knowingly or recklessly reviewing and approving, and failing to prevent the dissemination of false and misleading information in, the Company's earnings press releases,

SEC filings, and earnings guidance; (ii) knowingly or recklessly approving and/or allowing the Company to issue false and misleading statements to the investing public certifying that the Company maintained adequate and effective internal controls and procedures over financial reporting during the Relevant Period; and (iii) knowingly or recklessly failing to ensure that the Company had effectively functioning internal controls over financial reporting.

114.    In addition, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of, false and/or materially misleading earnings press releases and quarterly and annual financial statements, and failed in their specific duties to ensure that the Company's internal controls over financial reporting were sufficient, and that statements made by the Company regarding its business, operational, and compliance policies were accurate. These Defendants breached their fiduciary duties by, instead, causing the Company to make false and misleading statements.

115.    Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon the Audit Committee Defendants therefore is futile.

**C.    Demand is Futile as to Defendant McCarthy for Additional Reasons**

116.    In addition to the reasons discussed herein as to why demand is futile as to all Director Defendants, demand is futile as to McCarthy because, when this action was commenced, there was reason to doubt that McCarthy was an independent director capable of objectively considering a pre-suit demand.  Defendant McCarthy expressly made or authorized most, if not all, of the false and misleading statements and/or omissions alleged herein. Moreover, in addition to serving as a Director, McCarthy is also Frontier's CEO and President,

and thus not an independent director, as the Company has acknowledged (most recently in its 2017 Proxy).  Additionally, McCarthy's principal professional occupation was his employment with Frontier as its CEO, pursuant to which he was employed full-time and received substantial monetary compensation and other benefits in the amount of $8,431,707 between 2015 and 2016 alone.  Thus, McCarthy depends for his livelihood on his employment by Frontier.  As such, McCarthy cannot independently consider any demand to sue himself for breaching his fiduciary duties to Frontier because that would expose him to liability and threaten his livelihood.  Finally, McCarthy is named as a defendant in the Securities Class Actions and faces a substantial likelihood of liability in connection therewith.

## CAUSES OF ACTION

## COUNT I

### Breach of Fiduciary Duties for Disseminating False and Misleading Information to Shareholders (Individual Defendants)

117.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

118.    As alleged in detail herein, each of the Individual Defendants owed, and owe, Frontier and its shareholders fiduciary obligations, including the duties of care, loyalty, good faith, fair dealing, independence, oversight, and supervision.  These duties include the duty of full and fair disclosure to shareholders, also known as the duty of candor.  To execute this duty, the Individual Defendants were required to disseminate accurate, truthful, and complete information to shareholders at all times.

119.    In direct violation of these duties, the Individual Defendants each knowingly or recklessly issued, or approved the issuance of, false public statements to shareholders that misrepresented and/or failed to disclose material information concerning the Company's

business, operational, and compliance policies, including that (i) the Company acquired a substantial number of non-paying accounts as part of its acquisition of the wireline operations of Verizon; (ii) as a result, the Company would be required to increase its reserves, and write-off amounts from accounts receivable associated with the non-paying accounts; (iii) Frontier had inadequate corporate accounting and corporate financial reporting resources; (iv) Frontier inadequately assessed the risks associated with the Company's financial reporting; (v) Frontier failed to maintain effective internal controls over financial reporting; and (vi) as a result of the foregoing, Frontier's public statements were materially false and misleading at all relevant times. As a result of their fraudulent scheme, the Individual Defendants were able to artificially inflate the Company's financials, and its stock price, throughout the Relevant Period.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the best interests of the Company and its shareholders.

120.    As a direct and proximate result of the Individual Defendants' failure to perform these fiduciary obligations, Frontier has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

121.    Plaintiff, on behalf of Frontier, has no adequate remedy at law.

## COUNT II

### Breach of Fiduciary Duties for Failure To Maintain Internal Controls
### (Individual Defendants)

122.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

123.    As alleged in detail herein, each of the Individual Defendants had a duty to exercise good faith in order to ensure that the Company maintained adequate internal controls. When put on notice of problems with Frontier's business, operational and compliance policies,

and/or internal controls, each Individual Defendant was required to exercise good faith in taking appropriate action to correct the misconduct and to prevent its recurrence.

124.    In direct violation of these duties, the Individual Defendants willfully ignored the obvious and pervasive problems with Frontier's internal-control practices and procedures, and failed to make a good-faith effort to correct the problems or their recurrence.  As directors and/or officers of Frontier, the Individual Defendants were responsible for the authorizing of, or the failure to monitor, the business practices which resulted in violations of the law as alleged herein.  Each of the Individual Defendants had knowledge of and actively participated in, approved of, or acquiesced in the wrongdoings alleged herein.

125.    As a direct and proximate result of the Individual Defendants' failure to perform these fiduciary obligations, Frontier has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

126.    Plaintiff, on behalf of Frontier, has no adequate remedy at law.

## COUNT III

### Breach of Fiduciary Duties for Failure To Oversee and Manage the Company
### (Individual Defendants)

127.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

128.    As alleged in detail herein, each of the Individual Defendants had a duty to exercise prudent oversight and supervision of Company officers and other employees to ensure that they conducted Frontier's affairs in conformity with all applicable laws and regulations.

129.    In direct violation of these duties, the Individual Defendants turned a blind eye to their duties of oversight and supervision, and willfully or in bad faith, allowed Company officers or other employees to conduct the Company's operations in violation of applicable laws and

regulations, and in a manner that grievously harmed the best interests of the Company and its shareholders, rather than protecting those interests.

130.    As a direct and proximate result of the Individual Defendants' failure to perform these fiduciary obligations, Frontier has sustained significant damages, not only financially, but also to its reputation, corporate image, goodwill, and ability to continue as a going concern.

131.    As a direct and proximate result of the Individual Defendants' failure to perform these fiduciary obligations, Frontier has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

132.    Plaintiff, on behalf of Frontier, has no adequate remedy at law.

## COUNT IV

### Unjust Enrichment (Individual Defendants)

133.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

134.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Frontier.

135.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Frontier.

136.    Plaintiff, as a shareholder and representative of Frontier, seeks restitution from the Individual Defendants, the imposition of a constructive trust over the Individual Defendants' proceeds from their misconduct, and/or an order requiring the Individual Defendants to disgorge all profits, benefits, and other compensation obtained through, or as a result of, their wrongful conduct and fiduciary breaches.

137.    As a direct and proximate result of these Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

138.     Plaintiff, on behalf of Frontier, has no adequate remedy at law.

**COUNT V**

**Waste of Corporate Assets (Individual Defendants)**

139.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140.     The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Frontier's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing throughout the Relevant Period.   It resulted in continuous, connected, and ongoing harm to the Company.

141.     As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) paying excessive compensation and bonuses to certain of its executive officers;  (ii) awarding self-interested stock options to certain officers and directors;  and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions, including defending the Company and its officers against the Securities Class Actions.

142.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

143.     As a direct and proximate result of these Defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

144.     Plaintiff, on behalf of Frontier, has no adequate remedy at law.

## COUNT VI

### Violation of Section 14(a) of the Exchange Act (Individual Defendants)

145.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

146.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

147.    The Company's 2015, 2016, and 2017 Proxy Statements (collectively, the "Proxies") violated Section 14(a) and Rule 14a-9 by misrepresenting or failing to disclose that (i) Frontier had inadequate corporate accounting and corporate financial reporting resources; (ii) Frontier inadequately assessed the risks associated with the Company's financial reporting; (iii) Frontier failed to maintain effective internal controls over financial reporting; and (iv) as a result of the foregoing, Frontier's public statements were materially false and misleading at all relevant times.

148.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose these material facts, the statements contained in the Proxies were materially false and misleading.  The misrepresentations and omissions in the Proxies were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxies, including, but not limited to, election of directors, approval of officer compensation, and appointment of an independent auditor.

149.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' wrongdoing as alleged herein;

B.     Directing Frontier to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Frontier and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of Frontier's directors, executives, and other employees;

- a proposal to require an independent Chairman of the Board;

- a provision to permit the shareholders of Frontier to nominate three candidates for election to the Board;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test, and then strengthen, the Company's internal-operational control functions.

C.      Awarding to Frontier restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by each of them;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

DATED:  October 25, 2017                    **DISERIO MARTIN O'CONNOR & CASTIGLIONI LLP**

By:      *s/Jonathan P. Whitcomb*
         JONATHAN P. WHITCOMB

One Atlantic Street
Stamford, CT 06901
Telephone: (203) 569-1105
Facsimile: (203) 348-2321
Email: jwhitcomb@dmoc.com

*Local counsel for Plaintiff*

**JOHNSON FISTEL, LLP**
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101
MichaelF@johnsonfistel.com

**JOHNSON FISTEL, LLP**
Frank J. Johnson
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
FrankJ@johnsonfistel.com

*Counsel for Plaintiff*

# **VERIFICATION**

I, Celeste M. Baker, verify that I have reviewed the foregoing Verified Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated:  October 25, 2017



(Signature of Celeste M. Baker)